C.K.S. PACKAGING, INC.,

        PLAINTIFF,

V.

MILO'S TEA COMPANY,

        DEFENDANT.

CIVIL ACTION NO. _____

JURY DEMANDED

## ORIGINAL COMPLAINT

Plaintiff C.K.S. Packaging, Inc. ("**CKS**") files this Complaint against Defendant Milo's Tea Company, Inc. ("**Milo's**" or "**Defendant**") and respectfully shows as follows:

### I.      INTRODUCTION

1.     This dispute involves Milo's breach of its August 17, 2020 Purchase and Supply Agreement, as amended (the "**2020 PSA**") and its April 17, 2024 Supply Agreement (the "**Supply Agreement**") with CKS, Milo's improper attempt to terminate the 2024 Supply Agreement with CKS prematurely, and fraud and deceit in Milo's conduct relating to the 2024 Supply Agreement with CKS.

2.     CKS successfully supplied containers to Milo's for about 18 years under a series of agreements and amendments.

3.     Based upon the 2020 PSA and the Supply Agreement, CKS invested approximately Forty-Four Million Dollars ($44,000,000.00) of capital to install machinery / tooling and transportation assets (in multiple locations) dedicated to servicing the Milo's demand for Products at Milo's locations in Bessemer, Alabama and Homewood, Alabama, Owasso, Oklahoma, and Moore, South Carolina.

1

4.      CKS set aside dedicated production capacity for Milo's at five (5) CKS plants, to wit: CKS Atlanta – Tulane (5 lines); CKS Atlanta – Purdue (1 line); CKS Atlanta – Fisk (2 lines); CKS Dallas (3 lines); CKS Kimball (3 lines).

5.      CKS also provided and maintained a rotating fleet of approximately three hundred fifty (350) 53-foot trailers (and trailer parking lots) to support the Milo's demand for Products, because Milo's staged its production without sufficient warehousing for delivered bottles. CKS Products often remained on the CKS delivered trailers for days or even weeks before Milo's consumed the CKS bottles in the Milo's operation.

6.      On August 17, 2020, CKS and Milo's entered a Purchase and Supply Agreement for the purchase and sale of rigid plastic containers. In the 2020 PSA, Milo's agreed to purchase 100% of certain size containers from CKS. In addition to volume, payment, rebate, shipping and quality terms, the 2020 PSA provided that, if during the Term of the agreement, Milo's determined that an on-site/near site bottle manufacturing option was required by Milo's, CKS was entitled to the opportunity to meet or beat any competitive proposal for such an operation.

7.       Sometime in 2023, Milo's accepted a proposal from CKS's competitor (Altium Packaging) to contract and install an on-site/near-site bottle production and supply operation at the Milo's Bessemer, Alabama facility. Milo's refused to provide to CKS the relevant terms of the competitive proposal or to give CKS the opportunity to meet or beat the Altium Packaging proposal, all in breach of the 2020 PSA.

8.      Milo's acknowledged that it breached the terms of the 2020 PSA, but attempted to justify its breach by asserting that it would be unethical for Milo's to share the material terms of the competitive proposal as required by the 2020 PSA, which agreement was valid and binding upon Milo's prior to any Bessemer on-site proposal from Altium Packaging.

9.      On April 17, 2024, CKS and Milo's entered into a Supply Agreement for the purchase and supply of plastic bottles for Milo's products, with a guarantee that CKS would be entitled to supply 100% of Milo's requirements for certain facilities through December 31, 2027. Under the Supply Agreement, Milo's promised to purchase 100% of its annual requirements for rigid plastic containers for the Milo's Tulsa (Owasso, Oklahoma) and Milo's Spartanburg (Moore, South Carolina) facilities exclusively from CKS, and contracted to purchase specified containers for the Milo's Bessemer, Alabama facility.  In exchange, CKS provided a 3% discount on all products.

10.     In addition to product, pricing and quantity terms, the parties agreed upon shipping terms, freight rates, and specific quality control terms.  The Supply Agreement also explicitly provided that the parties would "cooperate reasonably" in investigations of any potential alleged defective products and agreed to periodically review in good faith and adjust freight costs as necessary.

11.     Notwithstanding the express terms of the Supply Agreement and the implicit requirement of good faith and fair dealing, Milo's has breached its obligations to CKS by alleging (but not substantiating) product defects, refusing to cooperate in investigations as required by the Supply Agreement, conspiring with CKS's competitors to supplant CKS in violation of the terms of the Supply Agreement, and repudiating the Supply Agreement in order to wrongfully terminate the Supply Agreement prematurely.   Milo's actions have damaged CKS and CKS is entitled to recover damages exceeding Ten Million Dollars ($10,000,000.00), which damages continue to accrue.

## II.      PARTIES

12.     Plaintiff C.K.S. Packaging, Inc. is a Georgia corporation, headquartered in Atlanta, Georgia.

13. Defendant Milo's Tea Company, Inc. is an Alabama corporation, headquartered in Bessemer, Alabama, and may be served with process through its registered agent, Corporate Service Company Inc., at 641 South Lawrence St., Montgomery, Alabama 36104. Summons is requested so it may be cited to appear.

### III. JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. §1332(a). Plaintiff and Defendant are citizens of different states and the amount in controversy exclusive of interest and costs exceeds $75,000.

15. The citizenship of corporations is determined by their principal place of business. CKS is headquartered in Georgia and Milo's is headquartered in Alabama. Thus, there is complete diversity between the Parties.

16. This Court has personal jurisdiction over Defendant because Defendant consented to personal jurisdiction in this Court in the Supply Agreement, the contract at issue in this dispute.

17. Venue is proper in the Middle District of Tennessee pursuant to 28 U.S.C. § 1391(b)(3) because Defendant is subject to personal jurisdiction in this District and consented to this venue for resolution of disputes in the Supply Agreement.

### IV. FACTUAL BACKGROUND

18. CKS is a family-owned and operated manufacturer of extrusion/blow and injection molded rigid plastic containers. CKS utilizes diverse manufacturing technologies to produce containers for a wide range of consumer goods and industrial products, including beverages, food, household items, personal care items and pharmaceutical products, agricultural chemicals, automotive products, industrial goods, and specialty items.

19. Milo's is a beverage manufacturer that brews, mixes, bottles, and packages its beverage products to send to suppliers and consumers. While Milo's brews, mixes, bottles, and

4

packages its products in-house, Milo's purchases its plastic bottles and containers that hold teas, lemonades, and other beverages, from third parties.

20.　　CKS successfully supplied plastic containers to Milo's for approximately 18 years prior to this dispute. CKS's performance scorecards from Milo's were excellent through March 2025.

21.　　CKS customized its blow molds to include Milo's branding insignia in the molds, so that the manufactured plastic bottles contained the embossed Milo's logo and insignia in the shape of the containers. It would require many months for a competitor of CKS to build the number of blow molds necessary to support the volume of bottles required by Milo's and Milo's is believed to have been conspiring with a competitor to supplant CKS prior to the alleged "Critical Defects" cited below. These specialty bottles manufactured for Milo's cannot be sold to other customers to make CKS whole for the costs and losses incurred by CKS.

A.　**The 2020 Purchase and Supply Agreement**

22.　　On August 17, 2020, Milo's and CKS entered into an agreement for the purchase and supply of 100% of certain sized containers for Milo's. **See Ex. 1 hereto**.

23.　　Section 16 of the 2020 PSA provided that, if during the term of the Agreement, Milo's determined that it required on-site/near-site production and supply for its containers, CKS would be entitled to provide a proposal to Milo's and, if Milo's received a proposal from a competitor, "Milo's shall… provide CKS with all relevant details of the competitive proposal" and allow CKS to meet or beat that competitive proposal. **Ex 1**, Section 16.

24.　　The 2020 PSA was extended by the parties several times, but Section 16 was never revised and remained in full force and effect throughout the agreement.

25.     In 2023, during the "Term" of the 2020 PSA, Milo's entered into an agreement with CKS's competitor, Altium Packaging, Inc., to produce gallon containers on-site at the Milo's Bessemer, Alabama plant. Milo's never provided CKS with the details of Altium's competitive proposal as required by the 2020 PSA even after written request from CKS for Milo's to share the relevant details, nor did Milo's allow CKS the opportunity to meet or beat Altium's proposal as required by the 2020 PSA. This action by Milo's directly violated Section 16 of the 2020 PSA and breached the terms of that agreement.

26.     Although CKS subsequently entered into the 2024 Supply Agreement with Milo's, the 2024 Supply Agreement addressed different terms (including volume, pricing, rebates and shipping terms). CKS maintained all of its rights, claims and remedies available to CKS for the Milo's breaches of the 2020 PSA, including, without limitation, the right of CKS to recover damages for the Milo's breaches of the 2020 PSA.

**B.  The 2024 Supply Agreement**

27.     On April 17, 2024, Milo's and CKS entered into a Supply Agreement ("**2024 Supply Agreement**") providing a three percent (3%) reduction in pricing of Products, with a term that continues through December 31, 2027. The Supply Agreement guarantees CKS the right to supply all containers to Milo's Tulsa (Owasso, Oklahoma) and Milo's Spartanburg (Moore, South Carolina) through December 31, 2027. *See* **Exhibit 2**, 2024 Supply Agreement.

28.     Pursuant to the terms of the Supply Agreement, Milo's agreed "to purchase exclusively from CKS, all of Milo's requirements for gallon and singles containers" manufactured at Milo's production facilities in Bessemer, Alabama, Homewood, Alabama, Tulsa, Oklahoma, and Spartanburg, South Carolina (excluding only specific gallon containers to be manufactured on-site at Bessemer, Alabama). *See* **Ex. 2**, § 2 at 1.

6

29.     CKS supplies its containers to Milo's from its manufacturing facilities in Atlanta, Georgia, Kansas City, Missouri, and Dallas, Texas. Notably, for the embossed containers, the CKS molds used to manufacture and supply containers to Milo's are customized to manufacture embossed specialty products for Milo's. *See* **Ex. 2**.

30.     The Supply Agreement provides that CKS will provide estimated numbers of four product types at a specified price and freight rate, including: embossed gallon containers, 20-ounce containers, 12-ounce containers, and half-gallon containers. *Id.* at Schedule 1.

31.     The Supply Agreement expressly provides in Section 8(c) that CKS and Milo's would periodically review freight costs and CKS may propose to Milo's a "Freight Adjustment".

32.     The Supply Agreement expressly defines "Critical Defects" in CKS' products as defects that resulted in at least 30 minutes of downtime at the relevant Milo's facility caused solely by the defect, and provides that, if CKS delivered product with "Critical Defects" on four or more separate occasions during a specific period, Milo's could terminate the Supply Agreement with 90 days' notice.

33.     At all relevant times, CKS performed in compliance with the terms of the Supply Agreement.

34.     Around April 15, 2025, Milo's began complaining of alleged "Critical Defects,"—in succession, claiming to find peanut fragments, candy wrappers, hay and "rainwater contamination" in CKS trailers—all after those trailers had been delivered to Milo's and were in the care, custody and control of Milo's personnel, often sitting at the respective Milo's facility for days or even weeks prior to the notice of the alleged "Critical Defect."

35.     Upon information and belief, Milo's personnel frequently used the CKS trailers for storage of Milo's own tea, corrugate and equipment contaminating the CKS trailers, a use not

contemplated or condoned by the Supply Agreement for CKS trailers in the regular supply rotation because of potential contaminants.

36. Notwithstanding the terms of the Supply Agreement, Milo's refused to cooperate with CKS to investigate, identify or confirm the root cause of any such claim or approve an action plan.

37. Instead, Milo's simply declared in letters from its Chief Operating Officer and/or Executive Vice President, Legal, that the incidents occurred, were somehow caused by CKS (and not Milo's employees who had a known history of intentionally or recklessly contaminating shipments from CKS), and resulted in 30-minute disruptions in Milo's production. These claims were not substantiated by Milo's.

38. Milo's refused to substantiate the alleged incidents with actual evidence, but rather, declared its purported "right" to terminate the Supply Agreement and declared an effective date of termination of September 8, 2025, more than two years before the December 31, 2027 term of the Supply Agreement.

39. Upon information and belief, Milo's assertion of "Critical Defects" and attempt to terminate the Supply Agreement corresponded with its acquisition of the plastic containers from one of CKS's main competitors, who, upon information and belief, was in the process of building molds to support the Milo's volumes well before any of the alleged "Critical Defects" had supposedly occurred.

40. Although the alleged "Critical Defects" related to transportation (i.e., alleged contamination in trailers only) and not CKS's manufacturing facilities, Milo's unilaterally disqualified CKS's manufacturing facility in Dallas, Texas. This had the effect of dramatically

increasing the transportation costs incurred by CKS to ship products from Atlanta, Georgia to Owasso, Oklahoma.

41.     CKS sent a Freight Adjustment notice to Milo's on or about June 10, 2025, in part, because CKS was forced to absorb approximately $100,000 per week in excess freight costs as a direct result of Milo's disqualifying the CKS Dallas Facility, without adequate justification (Notably the alleged "Critical Defect" Notice from Milo's related only to a disputed CKS trailer issue, not a manufacturing plant issue).

42.     In the interim, CKS was forced to manufacture products from CKS's out of region location in Atlanta, Georgia and ship those products to the Milo's Tulsa (Owasso, Oklahoma) location in order to prevent interruption of supply of Products to Milo's Tulsa, which directly increased the incurred freight costs by approximately $2,000 per truckload (for about 50 truckloads per week).

43.     Section 8(c) of the Supply Agreement entitles CKS to provide notice of increased freight costs. Within 10 days, Milo's must elect either (i) to accept the Freight Adjustment, or (ii) Milo's must assume all transportation and freight obligations under the Supply Agreement, including the provision of trailers for loading. *See* **Ex. 2** at 5-7.

44.     Section 8(c) provides that if the parties cannot agree on the Freight Adjustment within 10 days after CKS delivers notice of the Freight Adjustment, then Milo's shall assume sole responsibility for all transportation and freight obligations and the bottle price charged to Milo's would be adjusted to remove the freight component from the delivered bottle price. *Id.*

45.     Milo's refused the Freight Adjustment (in writing on several occasions), which made Milo's solely responsible for all transportation and freight obligations as of June 23, 2025. However, Milo's continually refused to perform those obligations. Milo's has incorrectly

9

mischaracterized that Freight Adjustment as an improper pricing change under an entirely different section of the Supply Agreement that does not apply to the situation.

46.     Milo's refused to accept the Freight Adjustment (that would be offset by the removal of the freight component from the bottle pricing), while also refusing to assume sole responsibility for all freight costs, in breach of Section 8(c) of the Supply Agreement, inexplicably claiming that this specified Freight Adjustment mechanism was itself a breach of the Supply Agreement and Milo's intended to terminate the Supply Agreement prematurely on September 8, 2025.

47.     This unlawful action and notice by Milo's that Milo's intended to breach the Supply Agreement from and after September 8, 2025 through December 31, 2027, constitutes an anticipatory repudiation of the Supply Agreement by Milo's. Milo's acted, and continues to act, in bad faith in breach of its duty of "good faith" under the Supply Agreement and the Alabama Uniform Commercial Code.

48.     As a result of Milo's anticipatory repudiation of the Supply Agreement, and in accordance with Alabama law, CKS delivered notice to Milo's in a letter dated July 11, 2025, demanding certain "adequate assurances" as provided in Section 7-2-610 of the Alabama CUCA explaining that the Milo's repudiation of the Supply Agreement excused any further performance by CKS. The July 11, 2025 letter from CKS to Milo's outlined terms that would be required for CKS to continue to perform, including that Milo's must undertake and perform its obligation to assume sole responsibility for all transportation and freight obligations as required by the Supply Agreement.

49.     Milo's performed in part, but failed in principal, paying a portion of the outstanding balance due and owing to CKS.  However, Milo's continued to refuse to assume sole responsibility

for all freight obligations and costs pursuant to Section 8(c) of the Supply Agreement, and Milo's again reiterated that it intended to terminate the Supply Agreement prematurely.

50.     On or about July 15, 2025, Milo's delivered notice to CKS that Milo's would not perform under the Supply Agreement effective immediately, and Milo's began cancelling orders for containers that CKS had already manufactured for the benefit of Milo's (approximately 50 truckloads of containers). Milo's refused to provide trailers and transportation arrangements for the specialty products, including those embossed with Milo's insignia and branding.

51.     Based upon these actions, and the lead time necessary to build the blow molds required to support the volume of containers required by Milo's, upon information and belief, Milo's had been conspiring with a CKS competitor for a considerable period of time to transition the purchase of containers to CKS's competitor in breach of the Section 16 Guarantee in the Supply Agreement.

52.     These wrongful acts, individually and collectively constitute material breaches of the Supply Agreement and affirmative repudiation of the Supply Agreement, which both excused further performance by CKS and entitled CKS to recover damages and costs over the remaining term of the Supply Agreement exceeding Ten Million Dollars ($10,000,000.00), together with punitive and exemplary damages.

**C. Milo's Pretextual "Critical Defects"**

53.     In early 2025, Milo's began alleging trailer quality claims related to CKS's delivery and transportation of its products to Milo's, primarily to the Milo's Tulsa Owasso, Oklahoma facility.

11

54.     For example, Milo's claimed that it found a candy wrapper in one of the trailers and such constituted a "Critical Defect" under the Supply Agreement, alleging it forced Milo's to shut down its manufacturing line for more than 30-minutes.

55.     Notably, even if a candy wrapper was found on the floor of a trailer that was not from a Milo's employee unloading the trailer, there could be no credible claim of contamination of the bottles, as CKS bottles were shipped "pillow packed," i.e., in sealed bags inside the trailer, thus preventing contact with any alleged contaminant on the trailer floor.

56.     Milo's failed to provide any evidence of the "candy wrapper" "Critical Defect" claim that allegedly shut down the Milo's lines for at least 30 minutes, nor did Milo's provide or permit CKS to review any alleged pictures, videos or statements of the Milo's personnel who allegedly found the offending wrapper, so that CKS might interview the Milo's personnel about the alleged candy wrapper.

57.     On or about April 15, 2025, Milo's complained of an alleged Critical Defect involving peanut fragments on the floor of a CKS trailer with pillow packed CKS bottles.

58.     In fact, CKS trailer GPS tracking records reflect that Milo's breached the seal of that CKS trailer with the alleged peanut fragments and removed some of the trailer contents, before relocating the trailer back to the storage area where it sat for several days without being re-sealed or secured by Milo's, during which time the trailer was accessible to Milo's personnel.

59.     Milo's provided no evidence that the peanut fragments were originally in the trailer (when the seal was first breached) and not placed in the trailer during the offloading process by Milo's personnel.

12

60. In fact, Milo's counsel admitted in writing (by email dated June 11, 2025) that Milo's tested for peanut allergens after Milo's claimed a "Critical Defect" from the "Peanut Incident" and all three (3) test results were negative for allergens.

61. On July 10, 2055, Milo's sent CKS a Letter, titled: "CKS's Breaches of the Supply Agreement; Rejection of Requested Variable; and Termination of Supply Agreement. *See* **Exhibit 3**, July 10, 2025, Letter from Milo's. In the July 10 Letter, Milo's cited a number of alleged "breaches" purported "Critical Defects," none of which meet the definition of "Critical Defect" in the Supply Agreement.

62. For example, Milo's cited as alleged "Critical Defects" the alleged presence of "candy wrappers" and "rainwater contamination" even though, upon information and belief, neither incident resulted in either (i) at least thirty (30) minutes of downtime on any fill line at a Milo's Facility caused solely by the defective Products, (ii) Milo's missing any delivery to its customer (after exhausting all inventory on-hand at the Milo's Facility), or (iii) Milo's customer rejecting or returning Milo's Product solely and directly due to CKS quality issues. Upon information and belief, Milo's simply pulled another trailer of bottles or wiped down the bags (as any reasonable person would) and used the bottles in its processing without any delay.

63. Upon information and belief, Milo's employees filled the alleged "Critical Defect" rainwater contamination bottles without incident and, in fact, the CKS trailers were returned empty. Furthermore, Milo's advised CKS not to interrupt delivery to Milo's due to the threat of rainy conditions that might produce "rainwater contamination."

64. Nevertheless, Milo's falsely asserted that each of ten enumerated alleged "Critical Defects" shutdown Milo's filling lines for at least 30 minutes, without providing any corroboration, evidence, appropriate documentation or receipts.

13

65.     Milo's alleged "Critical Defects" also overlook the fact that Milo's takes possession, dominion and control of the CKS trailers and contents once the trailers are delivered to the Milo's drop lot or filling facilities. Each CKS trailer is, therefore, subject to contamination by Milo's employees during the unloading process.

66.     Milo's has a history of claiming fraudulent bottle contamination complaints that were actually caused by the intentional wrongful actions of its own employees. For example, upon information and belief, a Milo's employee sabotaged products by placing metal washers in the bottles and claimed/reported contamination to the shift supervisor. Upon information and belief, Milo's employees are incented under the Milo's "Quality Hero" program to report "quality" issues. However, upon information and belief, the video footage from Milo's irrefutably demonstrated that the Milo's employee intentionally deposited the metal washers in the bottles, and the employee was allegedly terminated by Milo's.

67.     Milo's personnel regularly enter and exit these trailers, exert effective control over the trailers and their contents, regularly move the trailers around their lots, and even use the CKS trailers as temporary storage for Milo's materials separate and apart from the delivery of product from CKS.

68.     Milo's use of CKS trailers for storage for a number of different non-sanitary items (such as corrugate that can produce corrugate dust, or equipment that can leak lubricants, or tea and other substances that leave granules and remnants behind) undermines Milo's assertions that all trailers must be pristine, notwithstanding delivery of "pillow packed" CKS bottles, in order to comply with the Supply Agreement.

14

69.     The Supply Agreement includes an affirmative obligation for Milo's to reasonably cooperate to investigate and confirm any alleged defect to attempt to "determine a root cause as soon as reasonably practicable." Ex. 2, Section 5(b).

70.     However, Milo's ignored CKS's inquiries and requests for the details of the alleged "Critical Defects" and refused to grant CKS reasonable access to investigate the incidents. More importantly, Milo's refused to work cooperatively with CKS on all occasions to definitively identify and resolve root causes.

71.     Milo's refusal to provide any evidence to substantiate Milo's claims, much less cooperate to assist CKS to determine a root cause, constitutes breach of its obligations under the Supply Agreement.

**D.  The Dallas Audit**

72.     After alleging a "Critical Defect" based upon alleged peanut fragments on the floor of a trailer (on or about April 15, 2025), Milo's demanded an audit of the CKS Dallas Facility.

73.     Although CKS believed a plant audit to be unnecessary when the alleged issue arose from a trailer quality complaint, CKS acquiesced and allowed Milo's to conduct an audit of the CKS Dallas Facility on April 23, 2025.

74.     Milo's unilaterally disqualified the CKS Dallas Facility by letter dated April 25, 2025 (without providing the audit results and comments), despite the fact that the alleged issue was isolated to a single specific trailer, without reference to any specific audit findings of alleged potential peanut allergens in the CKS Dallas Facility.

75.     After approximately 6 weeks after Milo's disqualification of the CKS Dallas Facility, Milo's forwarded the results of Milo's audit to CKS on or about June 4, 2025.

15

76. CKS promptly investigated Milo's audit comments and responded with appropriate corrective action on June 18, 2025, which was accepted by Milo's by its acquiescence. (Milo's did not object or respond in any manner)

77. Nevertheless, Milo's refused to requalify the CKS Dallas Facility for the manufacture of Milo's products.

78. As a result of the Milo's punitive disqualification of the CKS Dallas Facility, CKS was required to manufacture and ship Milo's products from CKS's Atlanta Facilities at a substantially higher shipping cost from Atlanta, Georgia to Owasso, Oklahoma, a loss to CKS of approximately $2,000 per truckload for about 50 truckloads per week.

79. On or about June 10, 205 and after repeated requests from CKS to Milo's to re-engage the CKS Dallas Facility, and when Milo's demonstrated no care or concern that CKS was absorbing approximately $100,000 per week in excess transportation costs to ship products from Atlanta, Georgia to Owasso, Oklahoma, CKS exercised its rights under Section 8(c) of the Supply Agreement to announce a Freight Adjustment.

80. Milo's rejected CKS's Freight Adjustment and has wrongly asserted that the Section 8(c) Freight Adjustment was somehow a "Variable Cost Adjustment" under Section 4(e) of the Supply Agreement, which relates to increased costs of utilities, labor, insurance, taxes and other conversion costs to blow bottles (having nothing at all to do with freight costs). This assertion is merely more pretext for Milo's wrongful attempt to terminate the Supply Agreement prematurely.

81. Milo's refusal to accept the CKS Freight Adjustment as permitted under Section 8(c) constitutes breach of Section 8(c) of the Supply Agreement, because (among other things) Milo's refused to perform, and continues to refuse to perform, its obligations to assume sole

responsibility for all transportation obligations in breach of the Supply Agreement CKS has suffered damage arising directly from the Milo's breaches.

### E. Milo's Breach – Termination of the Supply Agreement

82.     By letter dated July 10, 2025, Milo's notified CKS that Milo's was seeking an "off ramp" and termination of the Supply Agreement effective as of September 8, 2025, based upon a number of unsubstantiated and demonstrably false claims relating to the Supply Agreement. *See* **Exhibit 3.**

83.     In response, on July 11, 2025, CKS explained that the 10 unsubstantiated "Critical Defects" were inaccurate and a pretext. Furthermore, CKS notified Milo's that Milo's July 10th letter constituted a breach and repudiation of the terms of the Supply Agreement. See **Exhibit 4**, July 11, 2025, CKS Letter to Milo's.

84.     Milo's repudiation excused any further performance by CKS and CKS demanded appropriate "adequate assurances" for CKS' further performance, including, without limitation, that Milo's provide trailers and take over sole responsibility for all freight and shipping obligations.

85.     Milo's refused to perform the transportation obligations and refused to provide "adequate assurance."

86.     Rather, on July 14, 2025, Milo's sent a letter in response to CKS's July 11 and July 14, 2025 Letters stating that "Milo's has not repudiated the Agreement and plans to honor the Agreement fully through the Termination Effective Date." *See* **Exhibit 5**, July 15, 2025.

87.     However, one day later, on July 15, 2025, Milo's counsel sent a letter to CKS claiming that Milo's was terminating the Supply Agreement immediately. *See* **Exhibit 6**, July 15, 2025, Termination of the Supply Agreement.

88. Upon information and belief, well before the first alleged, unsubstantiated "Critical Defect" asserted against CKS, Milo's had arranged to purchase product from CKS competitor Altium Packaging.

89. CKS was the exclusive manufacturer of Milo's 20-ounce containers (pursuant to the terms of the Supply Agreement) until the Milo's notice of termination on July 15, 2025. Yet on July 27, 2025, a CKS employee purchased at the Walmart Supercenter located at 1735 S. Highway 27, Carrollton, Georgia 30117 (i) a Milo's 20 once container (filled with Milo's Extra Sweet Tea product "Good Thru Date August 24, 2025"), and (ii) a Milo's 20 once container (filled with Milo's Lemonade product "Good Thru Date September 5, 2025"), each displaying the Altium Packaging logo. The market availability in July of Milo's product in Altium bottles (with a "Good Thru Date of August 24, 2025 that suggests that the bottle was filled approximately July 24, 2025) confirms that Milo's and Altium agreed to build and qualify molds for Milo's production months prior to any alleged "Critical Defect" by CKS. Moreover, there were no such "Critical Defects" reported or alleged by Milo's with respect to 20-ounce containers supplied by CKS. *See* **Exhibit 7**, Walmart Receipt 07/27/25.

90. Upon information and belief, Milo's conspired with CKS competitor Altium Packaging well before the first alleged incident of "Critical Defect." CKS was the exclusive manufacturer of Milo's 20-ounce containers (pursuant to the terms of the Supply Agreement) until the Milo's notice of termination on July 15, 2025. Yet on July 27, 2025, a CKS employee purchased two (2) Milo's 20 once containers (filled with "Milo's Famous Sweet Tea" product "Good Thru Date August 26, 2025", Mold Number "302-06", Cavity 25 and Cavity 25) displaying the Altium Packaging logo at the Kroger store located at 1355 South Park Street, U.S. Highway 27, Carrollton, Georgia 30117. The market availability in July of Milo's product packaged in

18

Altium Packaging bottles (likely filled about July 26, 2025) confirms that Milo's and Altium Packaging agreed to build and qualify molds for commercial production months prior to any alleged "Critical Defect" by CKS. Additionally, there were no such "Critical Defects" reported or alleged by Milo's with respect to 20-ounce containers supplied by CKS. *See* **Exhibit 8**, Kroger Receipt 07/27/25.

91. Upon information and belief, Milo's conspired with CKS competitor Altium Packaging well before the first alleged incident of "Critical Defect" by CKS. CKS was the exclusive manufacturer of Milo's 20-ounce containers (pursuant to the terms of the Supply Agreement) until the Milo's notice of termination on July 15, 2025. Yet on July 27, 2025, a CKS employee purchased a Milo's 20 once container (filled with "Milo's Famous Sweet Tea" product "Good Thru Date August 26, 2025", Mold Number "302-06", Cavity 24 and Cavity 32) displaying the Altium Packaging logo at the Publix Store located at 1109 South Park Street, Carrollton, Georgia 30117. The market availability in July of Milo's product packaged in Altium bottles (likely filled about July 26, 2025) confirms that Milo's and Altium agreed to build and qualify molds for commercial production months prior to any alleged "Critical Defect" by CKS. Additionally, there were no such "Critical Defects" reported or alleged by Milo's with respect to 20-ounce containers supplied by CKS. *See* **Exhibit 9**, Publix Receipt 07/27/25.

92. Upon information and belief, Milo's conspired with CKS competitor Altium Packaging well before the first alleged incident of "Critical Defect" by CKS. CKS was the exclusive manufacturer of Milo's 20-ounce containers (pursuant to the terms of the Supply Agreement) until the Milo's notice of termination on July 15, 2025. Yet on July 27, 2025, a CKS employee purchased (i) two (2) Milo's 20 once containers (filled with "Milo's Famous Sweet Tea" product "Good Thru Date August 24, 2025", Mold Number "302-06", Cavity 29 and Cavity 31),

and (ii) two (2) Milo's 20 once containers (filled with "Milo's Lemonde" product "Good Thru Date September 5, 2025", Mold Number "302-06", Cavity 24 and Cavity 25), each displaying the Altium Packaging logo at the Walmart store located at 7001 Concourse Parkway, Douglasville, Georgia 30134. The market availability in July of Milo's product packaged in Altium bottles (likely filled around July 24, 2025) suggests that Milo's and Altium agreed to build and qualify molds for commercial production months prior to any alleged "Critical Defect" by CSK. Additionally, there were no such "Critical Defects" reported or alleged by Milo's with respect to 20-ounce containers supplied by CKS. *See* **Exhibit 10**, Walmart Receipt 07/27/25.

93. Upon information and belief, the Altium Packaging mold "302-06" was ordered, built and qualified by Altium Packaging and Milo's over a period of many months, and prior to the Milo's scheme to allege "Critical Defects" to support its alleged right to terminate the Supply Agreement prematurely.

94. As further evidence of Milo's bad faith intentions to wrongfully terminate the Supply Agreement, in the email communication from Milo's COO Chris Droney's, dated July 15, 2025, and in Milo's General Counsel Allison Taylor's letter dated July 15, 2025, Milo's falsely claimed that, "On July 15, 2025, we became aware that CKS delivered a trailer of bottles to Milo's Tulsa facility that had inconsistent neck finish and dimensions, compromising product integrity and causing significant production downtime (1 hour 30 minutes). The bottles were delivered on CKS trailer #53R26029."

95. CKS requested pictures and samples of the alleged defective bottles, and permission to send CKS Quality Team personnel to the Milo's Tulsa Facility (in Owasso, Oklahoma) in order to conduct CKS' standard investigation of a quality complaint.

96.     Chris Droney (Milo's COO) responded to Dewayne Phillips (CKS EVP) that "there would be no need, because Milo's will be returning the trailer and all products."

97.     Milo's failed and refused to provide to CKS: (i) samples and pictures of the alleged damaged or defective products, and (ii) any evidence of the alleged *"significant"* production downtime.

98.     Milo's contacted CKS personnel and requested that CKS pick up the same CKS Trailer #53R26029 that was referenced on the Milo's listing of "empty trailers" for CKS to retrieve.

99.     CKS Trailer #53R26029 was the trailer referenced in Chris Droney's email claiming to house the allegedly defective containers that "had inconsistent neck finish and dimensions, compromising product integrity and causing significant production downtime (1 hour 30 minutes)."

100.    On August 1, 2025, when CKS recovered CKS Trailer #53R26029 referenced in Chris Droney's email, there were no samples, unused bottles or allegedly defective bottles present in the Trailer #53R26029.

101.    Upon information and belief, Milo's had used the bottles in its processing of finished goods and Milo's fraudulently asserted that "inconsistent neck finish and dimensions, compromising product integrity and causing significant production downtime (1 hour 30 minutes)" when Milo's appears to have filled all of the bottles creating finished products.

102.    Milo's misrepresentations and failure to substantiate inflammatory claims of product defect, evidence its bad faith intentions to wrongfully terminate the Supply Agreement prematurely.

103.    Milo's operated in bad faith to fabricate "Critical Defects" as a ruse to terminate the Supply Agreement prior to the expiration date of December 31, 2027, because Milo's was actively conspiring/colluding to build molds and planning to supplant CKS with a competitor (likely Altium Packaging).

## V.    CAUSES OF ACTION

### COUNT 1: BREACH OF 2024 SUPPLY AGREEMENT

104.    CKS re-alleges and incorporates by reference all factual allegations in preceding paragraphs as if fully set forth herein.

105.    CKS and Milo's entered into a valid, enforceable contract in 2024. *See generally* Ex. 2.

106.    CKS fully performed under the Supply Agreement by manufacturing, producing, selling, and delivering commercially acceptable quality containers to Milo's as defined in the Supply Agreement from the beginning of the term up through Milo's material breaches of the Supply Agreement, as defined herein.

107.    Milo's committed multiple breaches of the 2024 Supply Agreement and repudiated it, as described above, which constitute material breaches of the 2024 Supply Agreement.

108.    As a result of Milo's breaches and repudiation of the 2024 Supply Agreement, CKS has incurred economic damages that currently exceed $10,000,000 and continue to accrue.

109.    CKS is entitled to recover damages from Milo's in an amount proven at trial.

### COUNT 2: BREACH OF 2020 PURCHASE & SUPPLY AGREEMENT

110.    CKS re-alleges and incorporates by reference all factual allegations in the preceding paragraphs as if fully set forth herein.

111.    CKS and Milo's entered into a valid and enforceable contract – the 2020 PSA. *See* Ex. 1.

22

112.    CKS fully performed under the 2020 PSA by manufacturing, producing, selling, and delivering the Milo' products defined in that agreement from the beginning of the term up through Milo's materials breaches of the 2020 PSA, specifically Section 16 of the 2020 PSA.

113.    Milo's failure to allow CKS to consider, and meet for beat, Altium's proposal to construct and provide on-site/near-site supply of gallon containers at Milo's Bessemer, Alabama site breached the 2020 PSA. As a result of Milo's breach, CKS was damaged, in an amount to be proven at trial, by the loss of profit guaranteed it for sale of gallon in containers to Milo's Bessmer, Alabama plant.

## COUNT 3: FRAUD

114.    CKS re-alleges and incorporates by reference all factual allegations in preceding paragraphs as if fully set forth herein.

115.    Milo's made certain representations to CKS, including but not limited to:

   a.   That peanut fragments were present in certain CKS trailers at the time of delivery, constituting a "Critical Defect" under the terms of the Supply Agreement;

   b.   That candy wrappers were present in certain CKS trailers at the time of delivery, constituting a "Critical Defect" under the terms of the Supply Agreement.

   c.   That hay or straw was present in certain CKS trailers at the time of delivery, constituting a "Critical Defect" under the terms of the Supply Agreement;

   d.   That rainwater contamination was present in certain CKS trailers, causing contamination to the products therein, constituting a "Critical Defect" under the terms of the Supply Agreement;

23

e.   That Milo's was entitled to audit CKS' Dallas Facility as a result of alleged "Critical Defects";

f.   That the results of the CKS Dallas Audit prohibited CKS from fulfilling Milo's orders out of the CKS Dallas Facility; and

g.   That Milo's intended to fulfill its contractual obligations under the terms of the Supply Agreement.

116.   These representations were false, and Milo's knew they were false, or Milo's recklessly misrepresented the facts without true knowledge thereof, or Milo's misrepresented the facts by mistake with the intention that CKS should rely on them.

117.   The Milo's misrepresentations regarding the existence of 10 alleged "Critical Defects" and entitlement to relief resulting from such 10 "Critical Defects" are material facts concerning the performance obligations of CKS and Milo's under the terms of the Supply Agreement.

118.   Milo's made these material misrepresentations with the intent to injure and deceive CKS by terminating its contractual obligations under the terms of the Supply Agreement.

119.   In reliance on Milo's material misrepresentations, CKS permitted Milo's to conduct the CKS Dallas Audit, CKS began manufacturing products in Atlanta, Georgia (to prevent interruption in the supply of bottles to Milo's) and shipping those products to Milo's Tulsa in Owasso, Oklahoma at a substantial additional freight cost to CKS, CKS added 230 new trailers (53 foot trailers) to support the new trailer requirements demanded by Milo's, CKS turned in a number of trailers and replaced them with new trailers at a substantial additional cost to CKS (to satisfy Milo's fraudulent trailer quality complaints), CKS made significant transportation and shipping procedural changes (to satisfy Milo's fraudulent trailer quality complaints) and CKS

substantially altered its ordinary course of business with Milo's at a cost to CKS, all in reliance upon the Milo's fraudulent trailer quality complaints.

120.    CKS avers that Milo's engaged in a fraudulent scheme whereby Milo's sought to deceive CKS with respect to the existence of certain 10 "Critical Defects" as a basis for its breach of the Supply Agreement and seek alternative business relationships that were to the benefit of Milo's.

121.    As a proximate cause of Milo's fraudulent, material misrepresentations, CKS has suffered economic damages, currently exceeding $10,000,000 and continuing to accrue.

122.    Milo's consciously or deliberately engaged in oppression, fraud, wantonness, or malice, and with the intent to injure or deceive CKS, thereby entitling CKS to recover damages in an amount to be proven at trial, including punitive and exemplary damages.

## COUNT 4: DECEIT

123.    CKS re-alleges and incorporates by reference all factual allegations in preceding paragraphs as if fully set forth herein.

124.    Milo's conduct, as described above, constitutes deceit and fraudulent deceit under Sections 6-5-103 and 6-5-104 of the Alabama Code.

125.    Milo's made certain representations to CKS, including but not limited to:

    a.  That peanut fragments were present in certain CKS trailers at the time of delivery, constituting a "Critical Defect" under the terms of the Supply Agreement;

    b.  That candy wrappers were present in certain CKS trailers at the time of delivery, constituting a "Critical Defect" under the terms of the Supply Agreement.

25

c. That hay or straw was present in certain CKS trailers at the time of delivery, constituting a "Critical Defect" under the terms of the Supply Agreement;

d. That rainwater contamination was present in certain CKS trailers, causing contamination to the products therein, constituting a "Critical Defect" under the terms of the Supply Agreement;

e. That Milo's was entitled to audit CKS' Dallas Facility as a result of alleged "Critical Defects";

f. That the results of the CKS Dallas Audit prohibited CKS from fulfilling Milo's orders out of the Dallas Facility; and

g. That Milo's intended to fulfill its contractual obligations under the terms of the Supply Agreement.

126. These representations were false, and Milo's knew they were false, or recklessly misrepresented the facts without true knowledge thereof, or Milo's misrepresented the facts by mistake with the intention that CKS should rely on them.

127. The Milo's misrepresentations regarding the existence of 10 alleged "Critical Defects" and entitlement to relief resulting from such 10 "Critical Defects" are material facts concerning the performance obligations of CKS and Milo's under the terms of the Supply Agreement.

128. Milo's made these material misrepresentations with the intent to deceive CKS and establish an improper and fraudulent basis to terminate its contractual obligations under the Supply Agreement prematurely.

129. CKS justifiably relied on these material misrepresentations by Milo's when CKS engaged in attempts to investigate the alleged "Critical Defects", allowed Milo's to conduct the

26

CKS Dallas Audit, CKS began manufacturing products in Atlanta, Georgia and shipping those products to Milo's Tulsa in Owasso, Oklahoma at a substantial additional freight cost to CKS, CKS added 230 new trailers (53 foot trailers) to support the new trailer requirements demanded by Milo's, CKS turned in a number of trailers and replaced them with new trailers at a substantial additional cost to CKS, CKS made significant transportation and shipping procedural changes to satisfy Milo's fraudulent trailer quality complaints, and CKS substantially altered its ordinary course of business with Milo's, all in reliance upon the Milo's fraudulent trailer quality complaints.

130.    As a proximate cause of Milo's willful and deliberate attempts to deceive CKS, CKS has suffered economic damages that currently exceed $10,000,000 and continue to accrue.

131.    Milo's consciously or deliberately engaged in oppression, fraud, wantonness, or malice, and with the intent to injure or deceive CKS, thereby entitling CKS to recover its damages in an amount to be determined, including punitive and exemplary damages.

## VI.    CONDITIONS PRECEDENT

132.    All conditions precedent to the assertion of each claim made by CKS have been performed, have occurred, or are excused.

## VII.    DAMAGES

133.    Plaintiff seeks recovery of its actual damages, including its loss of goodwill and lost profits. Plaintiff also seeks exemplary and punitive damages for Defendant's wrongful acts which were committed with malice or fraud.

134.    Plaintiff requests the court award CKS its attorneys' fees as provided by the Alabama Litigation Accountability Act for any and all defenses asserted without substantial justification and Defendant's unnecessary expansion of these proceedings.

135.    Plaintiff requests that the Court order an audit of Milo's records to confirm that CKS has supplied, and continues to supply, one hundred percent (100%) of the Milo's

27

requirements for containers (the CKS "**Share of the Business**") as required by Section 16 of the Supply Agreement, and award CKS all damages for Milo's breach of its guarantee of the 100% Share of Business through December 31, 2027.

136. Plaintiff requests the Court award CKS pre-judgment and post-judgment interest, and costs it incurs.

## VIII. JURY DEMAND

137. Plaintiff demands a trial by jury on all claims subject to a jury trial.

## IX. PRAYER

Plaintiff requests that it be granted judgment against Defendants for the cause of action stated in this Original Complaint, and that Plaintiff be awarded: (1) compensatory damages against Defendants for their various and continuing breaches of the Supply Agreement, fraud, and specific performance of the terms of the Supply Agreement; (2) punitive damages for Milo's schemes of fraud and deceit done with the intent to injure Plaintiff; (3) pre-judgment and post-judgment interest as provided by law; (4) costs of suit; (5) reasonable and necessary attorneys' fees as provided by law; and (6) other and further relief to which Plaintiff may be justly entitled.

Respectfully submitted on this 7th day of August, 2025,


By: */s/Robert E. Boston*
     Robert E. Boston, TN BPR No. 009744
     Karolyn Perry, TN BPR No. 036900
     HOLLAND & KNIGHT LLP
     511 Union Street, Suite 2700
     Nashville, TN 37219
     Tel: (615) 850-8953
     Fax: (615) 244-6804
     Bob.Boston@hklaw.com
     Karolyn.perry@hklaw.com

      *ATTORNEYS FOR PLAINTIFF*
      *C.K.S. PACKAGING, INC.*

28