# EXHIBIT 1

2020 PSA

DocuSign Envelope ID: 40171ABA-0E0F-433D-B655-AB90370CE2D5

# Purchase and Supply Agreement
# C.K.S. Packaging, Inc. / Milo's Tea Company, Inc.

**THIS PURCHASE AND SUPPLY AGREEMENT** (this "**Agreement**") is entered into by and between **C.K.S. PACKAGING, INC.**, a Georgia corporation with offices located at 350 Great Southwest Parkway, SW, Atlanta, Georgia 30336 (hereinafter referred to as "**CKS**") and **MILO'S TEA COMPANY, INC.** (hereinafter referred to as "**Milo's**") dated August 17, 2020 (the "**Effective Date**") sets forth the terms for purchase of plastic containers by Milo's supplied from CKS. Both Parties, CKS and Milo's may be individually referred to herein as the "**Party**" or collectively as the "**Parties**".

**NOW, THEREFORE**, for and in consideration of the following covenants, the Parties hereto agree that the terms of the agreement shall be as follows:

1. **Container Description:** Milo's agrees to buy from CKS 100% of Milo's requirements for the following containers, and CKS agrees to sell the following containers to Milo's:

| Container Size Ounce/ Description Destination: Bessemer, AL | Container Weight (Grams) | Resin | Color | Finish | Delivered Price per thousand as of 8/1/20 | Estimated Annual Unit Volume |
|---|---|---|---|---|---|---|
| 12oz * | 19 | HDPE | Nat. | DBJ | $69.08 | 1,445,626 |
| 20oz * | 27 | HDPE | Nat. | DBJ | $85.16 | 36,177,089 |
| 64oz * | 42 | HDPE | Nat. | DBJ | $160.09 | 464,797 |
| 128oz Milo's * | 68 | HDPE | Nat. | DBJ | $181.12 | 57,704,279 |
| 128oz Generic * | 65 | HDPE | Nat. | DBJ | $178.48 | 603,187 |

| Container Size Ounce/ Description Destination: Tulsa, OK | Container Weight (Grams) | Resin | Color | Finish | Delivered Price per thousand as of 8/1/20 | Estimated Annual Unit Volume |
|---|---|---|---|---|---|---|
| 12oz * | 19 | HDPE | Nat. | DBJ | $69.08 | 361,406 |
| 20oz *** | 27 | HDPE | Nat. | DBJ | $86.99 | 9,044,272 |
| 64oz ** | 42 | HDPE | Nat. | DBJ | $165.04 | 116,199 |
| 128oz Milo's ** | 68 | HDPE | Nat. | DBJ | $193.65 | 14,426,070 |
| 128oz Generic ** | 65 | HDPE | Nat. | DBJ | $189.62 | 150,797 |

*Product produced in Atlanta, GA
**Product produced in Kansas City, MO
***Product produced in Dallas, TX

(identified containers produced in Atlanta, GA, Kansas City, MO, and Dallas, TX hereinafter referred to as the "**Product**" including any new, alternative or replacement containers affecting the volume of these items).

2. **Secondary Packaging:** Each Product will be packed in poly bags as more particularly described in Schedule A, attached hereto and made a part of this Agreement. If any other unitization shall be required by Milo's (whether wooden pallets and top frame, and/or corrugated tier sheets), dunnage shall be subject to a separate charge and line item in the billing to Milo's, including a separate charge of $10.00 per pallet for any wooden pallets required.

3. **Volume Commitment:** Milo's agrees to purchase 100% of Milo's Section 1 Product needs from CKS during the Term (as defined below) of this Agreement. If CKS is unable to supply 100% of Milo's Section 1 container needs, then Milo's may, at its discretion, purchase Products temporarily from an alternative supplier in the limited amount necessary to meet the unfulfilled supply only until such time that CKS notifies Milo's that CKS can resume 100% supply of the Section 1 Products.

4. **CKS Capital Investment:** CKS will be responsible for purchasing and maintaining the equipment and CKS Stock Molds (owned exclusively by CKS) to supply the Estimated Annual Unit Volumes for each Product over the Term of this Agreement. Furthermore, it is understood that CKS has made a significant capital investment in machinery, molds, tooling and downstream equipment to support the Milo's business. In the event that, Milo's purchase volumes grow to a point that appropriate support for the Milo's business would require additional capital investment by CKS in blow-molding machine(s) and associated molds/tooling/equipment, the Parties will negotiate a mutually acceptable extension to the Term of this Agreement to justify the CKS additional capital investment.

5. **Term:** The term of this Agreement shall commence on the Effective Date and shall continue for an initial period of three (3) years ("**Initial Term**") after the date of execution and delivery of this Agreement by each Party. This Agreement will be renewed and extended automatically, and roll forward in twelve (12) month increments (a "**Renewal Term**"), unless written notice is received by either Party of that Party's intent to terminate this Agreement at least ninety (90) days before the end of the Initial Term or any Renewal Term.

6. **Price Adjustments:** Each Product price will be adjusted for changes in HDPE resin pricing based on the formula and schedule set forth in Section 7 below. Each Product price is effective as of August 1, 2020 per thousand units. Likewise, any corrugation used in the packaging of "Product" will be subject to cost changes as published by "PPI Pulp & Paper Week". Other than resin and corrugation price adjustments as provided in this Agreement, each Product price will remain fixed for the first twelve (12) months. Product prices are subject to an annual review for volume, payment history and changes in component costs including, but not limited to, increases in secondary packaging, freight, utilities, labor, insurance, and/or taxes, but any CKS Product price increases associated with these component costs will be approved by the mutual agreement of CKS and Milo's.

7. **Escalator/De-escalator**: The Product price outlined above is based upon HDPE resin pricing as published in Chemical Data L.P. Large Buyer Index ("**CDI**") for June 2020. Changes in the Product price will be adjusted for resin movement as reflected in the CDI Published Announcement and will be computed using the following formula: the gram weight of the bottle multiplied by .0245 multiplied by the change in the resin price per pound. Any adjustment in price will be effective upon thirty (30) days' notice to Milo's by CKS.

8. **CDI Non-Market Adjustment:** It is understood by the Parties that CDI from time to time makes non-market adjustment to the CDI published prices to reflect changes the indexed resin price unrelated to the actual price of the resin. The Parties agree that any non-market adjustments shall not affect the Product price and will be excluded from the resin movement calculation outlined in Section 7 herein.

9. **Quality/Performance:** CKS agrees to manufacture the Products in accordance with Good Manufacturing Practices (GMP) and standards (subject to industry variances and tolerances) in accordance to Milo's and CKS's mutually agreed specifications (referred to as "**Specifications**"). Milo's shall have the right to inspect all Products within ten (10) days after delivery. In the event Product does not meet the agreed Specifications, Milo's shall notify CKS's designated agent who shall have the right to inspect the Product at Milo's operating facility prior to the return of any Product to CKS. In order to avoid any supply disruptions, in the event that the identified issue is not resolved immediately, CKS will move the molds to another CKS machine/plant and manufacture same-Specification containers as needed. If CKS is unable to remedy any alleged quality issue, with an acceptable Corrective Action Plan, within thirty (30) days after receipt of written notice from Milo's, Milo's may terminate this Agreement. Specifications for each Product are listed on Schedule A, attached hereto and made a part of this Agreement.

10. **Shipping Terms:** All shipments are Delivered to Milo's facilities in Bessemer, AL and Tulsa, OK.

> a. CKS will provide to Milo's delivery availability for Products seven (7) days per week (as may be required by Milo's), although CKS manufacturing schedules for Products are six (6) days per week.
>
> b. CKS will provide up to a total of seventy (70) dropped trailers at Milo's locations. Additional trailers required by Milo's will be billed separately to Milo's at a monthly rate of $400.00/month per unit. The CKS dropped trailers are provided by CKS as an accommodation to Milo's for the sole purpose of delivery and staging of Products for Milo's operations. In no event shall the CKS dropped trailers be hauled on public roadways more than one mile (specifically to/from the dropped trailer lot to/from the Milo's filling location) except by CKS drivers (or CKS' designated transportation personnel or agents). Milo's shall provide access, ingress/egress and a secure location for CKS' dropped trailers at the Milo's location.
>
> c. A Fuel Surcharge for each truckload will be invoiced via separate line item on each invoice. Fuel Surcharge will be determined for each shipment as indexed weekly by the U.S. Department of Energy's Retail On-Highway Diesel Prices index. CKS and Milo's agree to review changes in the applicable freight costs on a semi-annual basis and, when

DocuSign Envelope ID: 40171ABA-0E0F-433D-B655-AB90370CE2D5

mutually agreed in writing by both parties, adjust the delivered price of bottles accordingly. Should agreement not be reached on a freight cost adjustment, Milo's will assume responsibility for the Product Freight and pricing and terms will be adjusted to FOB CKS plant of manufacture.

11. **Payment Terms:** Payment terms will be two percent (2%) discount if paid within ten (10) days after the CKS invoice date, and net thirty (net 30) days after the CKS invoice date. In the event Milo's fails to pay timely, Milo's agrees to pay interest of one percent (1%) per month on the payables that are beyond terms.

12. **Inventory:** If inventory or materials being held for Milo's as a result of a purchase order or forecast become obsolete during the Term, or have been held by CKS for more than three (3) months, or are on hand after expiration or termination of this Agreement, CKS may deliver such inventory or materials to Milo's and invoice Milo's at CKS' then current prices for inventory or indexed prices for raw materials plus applicable storage costs. Milo's shall make payment to CKS within thirty (30) days after the CKS invoice date.

13. **Minimum Production Runs / Minimum Order Quantity:** Milo's agrees that the minimum purchase order quantities (for each Product SKU) for CKS production runs shall be no less than truckload quantities.

14. **EXCLUSION OF ALL OTHER WARRANTIES:** EXCEPT AS DEFINED HEREIN, SPECIFICALLY, PARAGRAPH NINE (9), THE COMMITMENTS EXPRESSED IN THIS AGREEMENT ARE CKS' SOLE WARRANTIES RESPECTING THE PRODUCTS AND ARE MADE EXPRESSLY IN LIEU OF, AND EXCLUDE, ANY IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE AND ALL OTHER EXPRESS OR IMPLIED REPRESENTATIONS AND WARRANTIES PROVIDED BY STATUTE OR COMMON LAW. MILO'S ASSUMES ALL RISKS AND LIABILITIES RESULTING FROM THE USE OF THE PRODUCTS DELIVERED HEREUNDER. PRODUCT COMPATIBILITY IS THE SOLE RESPONSIBILITY OF MILO'S.

15. **LIMITATION OF LIABILITIES:** THE PARTIES HERETO AGREE THAT CKS, AT ITS OPTION, SHALL EITHER (A) REPLACE ANY DEFECTIVE PRODUCT OR (B) ISSUE A CREDIT FOR THE DEFECTIVE PRODUCT, AS THE SOLE AND EXCLUSIVE REMEDY OF MILO'S. NEITHER PARTY WILL BE LIABLE TO THE OTHER PARTY, OR ANY OTHER PARTY, FOR ANY SPECIAL, INCIDENTAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES, LOSSES, OR INJURIES (INCLUDING LOST PROFITS). TO THE EXTENT THERE IS A DISPUTE HEREUNDER REGARDING ANY PRODUCT DEFECT, THE MAXIMUM LIABILTY FOR ANY CLAIM (WHETHER BASED ON CONTRACT OR TORT) SHALL NOT EXCEED THE PURCHASE PRICE OF THE PRODUCT FOR WHICH DAMAGES ARE CLAIMED, OR AT THE ELECTION OF CKS, THE REPLACEMENT OF THE DEFECTIVE OR DAMAGED PRODUCT.

16. **On-Site Manufacturing Business Option:** If, during the Term of this Agreement, Milo's determines that an on-site/near-site option is required by Milo's for the supply of its containers, CKS will provide a proposal (on-site/near-site) for review by Milo's within a commercially

DocuSign Envelope ID: 40171ABA-0E0F-433D-B655-AB90370CE2D5

reasonable period after a request by Milo's. If Milo's receives a competitive proposal for an on-site/near site operation, Milo's shall (within 5 days after receipt by Milo's) provide CKS with all relevant details of the competitive proposal, so that CKS may formulate a competitive response based on the same on-site/near site operation criteria. CKS shall be entitled to consider the competitive proposal for a period of 30 days after CKS' receipt of the competitive proposal and CKS may determine whether CKS will match the competitive proposal during this period. Should CKS choose not to match the competitive on-site/near-site proposal, then Milo's may terminate this Agreement effective as of the date that is 180 days after the date of delivery of written notice to CKS.

17. **Force Majeure:** If either Party to this Agreement is unable to perform its obligations under this Agreement as a consequence of a delay or failure from any cause or event beyond the control of such Party (referred to herein as the "**Disabled Party**"), including but not limited to war, riots, acts of God or public enemy, fire, explosion, flood, earthquake, strikes, lockouts or other labor disturbances, embargo, pandemic, public health crisis or actions from any governmental authority (referred to herein as "**Force Majeure**"), such Disabled Party shall be excused from the performance of such obligations for the period of, and extent of, any such cause or event of Force Majeure. On the cessation or termination of any event of Force Majeure, the Disabled Party shall notify the Party whose performance has not been excused of such cessation or termination, and the Disabled Party's performance under this Agreement shall recommence subject to an allowance for a reasonable amount of time to rebuild or repair any damage or injury caused by the Force Majeure event, if any, which is necessary to the Disabled Party's performance.

18. **Assignment:** This Agreement and all the provisions hereof shall be binding upon, and inure to the benefit of, the Parties hereto and their respective successors and permitted assigns. Neither Milo's nor CKS shall assign this Agreement without the prior written consent of the other Party, which consent which will not be unreasonably withheld or delayed.

19. **Governing Law:** This Agreement shall in all respects be governed by, construed and enforced in accordance with the laws of the State of Alabama applicable to contracts. This Agreement shall be governed by the internal laws of the State of Alabama without regard to its conflicts of law principles. Any legal action, suit or proceeding arising out of or relating to this Agreement shall be instituted, heard and adjudicated in a state or federal court located in Atlanta, Georgia.

20. **Notices:** All notices hereunder shall be deemed to have been sufficiently given if in writing and sent via U.S. Postal Service Registered or Certified mail, postage prepaid, return receipt requested, or shall be hand delivered to the Party to be notified (with copies directed as provided hereinbelow), at the addresses set forth herein below or at such other addresses as the Parties shall designate to each other in the manner prescribed for Notice herein:

<u>If to CKS to:</u>     C.K.S. PACKAGING, INC.
             Attention: General Counsel
             350 Great Southwest Parkway, SW
             Atlanta, Georgia 30336

<table>
<tr><td>If to Milo's to:</td><td>MILO'S TEA COMPANY, INC.<br>Attention: Legal Department<br>2204 Lakeshore Drive, Ste 325<br>Birmingham, Alabama 35209</td></tr>
</table>

Every notice shall be deemed to have been given at the time it shall be delivered, refused by the addressee, or determined by the United States Postal Service or by an independent third-party courier to be undeliverable as addressed. Changes of address shall be effective when provided in writing to all Parties receiving Notices hereunder.

21. **Annual Rebate:** This Parties hereto agree that CKS shall pay to Milo's an annual rebate, as applicable and as earned hereunder (referred to as the "**Annual Rebate**"), within sixty days (60) days after the end of each 12-month measurement period (commencing July 1, 2019 through June 30, 2020 and continuing with a succeeding review period during the succeeding 12 months, referred to as the "**Annual Measurement Period**") during the Term of this Agreement, calculated upon "net sales" of all Product SKUs only (excluding, taxes, fees, returns, packing, corrugation, dunnage, insurance, freight, shipping and handling) to Milo's for Product purchase volumes paid to, and collected by, CKS during the applicable Annual Measurement Period (referred to as "**Qualified Purchases**") as a function of the growth in annual Product purchase volumes (by total quantity of containers, referred to as "**Units**"), year-over-year comparing the initial baseline volume measurement for the period July 1, 2019 through June 30, 2020 (referred to as the "**Initial Baseline Volume Measurement**") to the volume of Qualified Purchases in the applicable Annual Measurement Period (referred to herein as the "**Current Year Baseline Volume Measurement**"), provided that the baseline volume measurement shall reset annually to the greater of (X) the Initial Baseline Volume Measurement, (Y) the volume of Qualified Purchases in the immediately preceding Annual Measurement Period (referred to herein as the "**Preceding Year Baseline Volume Measurement**"), and (Z) the Current Year Baseline Volume Measurement, more particularly described as follows:

(a) **Tier 1:** CKS shall pay to Milo's a rebate of 0.50% of the Qualified Purchases of all Products during the Annual Measurement Period if Milo's achieves Product purchase growth (by Units, year-over-year) in the range from 0.00% but less than 20% year-over-year (provided that Milo's Qualified Purchases of Products must exceed aggregate Units purchased during the immediately preceding Annual Measurement Period); or

(b) **Tier 2:** CKS shall pay to Milo's a rebate of 1.00% of the Qualified Purchases of all Products during the Annual Measurement Period if Milo's achieves Product purchase growth (by Units, year-over-year) in the range from 20.00% but less than 40% year-over-year (provided that Milo's Qualified Purchases of Products must exceed aggregate Units purchased during the immediately preceding Annual Measurement Period); or

(c) **Tier 3:** CKS shall pay to Milo's a rebate of 1.50% of the Qualified Purchases of all Products during the Annual Measurement Period if Milo's achieves Product purchase growth (by Units, year-over-year) of 40% or more year-over-year (provided that Milo's Qualified Purchases of Products must exceed aggregate Units purchased during the immediately preceding Annual Measurement Period).

The Annual Rebate shall be determined and paid based upon the applicable tier achieved by Milo's for the aggregate Qualified Purchases of all Products during the applicable Annual Measurement Period (by Units, year-over-year), whether Tier 1 under subsection 21(a), Tier 2 under 21(b), or Tier 3 under 21(c), but the tiers shall not be cumulative or additive among the tiers (only one achieved tier, if applicable, will apply during any Annual Measurement Period). No Annual Rebate shall be earned or paid to Milo's unless: (i) the total amount of Units purchased in the applicable Annual Measurement Period (meaning the Current Year Baseline Volume Measurement) shall exceed the total Units purchased in the immediately preceding Annual Measurement Period (meaning the Preceding Year Baseline Volume Measurement); and (ii) the total amount of Qualified Purchases in the applicable Annual Measurement Period (meaning the Current Year Baseline Volume Measurement) shall exceed the Qualified Purchases establishing the Initial Baseline Volume Measurement. This Annual Rebate offer to Milo's shall supersede any previous rebate program, course of conduct or arrangements between the Parties. For illustrative purposes, attached hereto on Schedule B, is a sample calculation of the foregoing 3-Tiered Rebate Structure based upon a single Product category (128 ounce container).

22. **Entire Agreement:** This Agreement constitutes the entire Agreement between the Parties (and supersedes any previous agreements, discussions or representations), and as an inducement to enter into this Agreement, each Party represents to the other Party that no representation, warranties or statements have been made to the Party that would in any way modify any of the provisions of this Agreement. The provisions of this Agreement shall not be modified by any agent or representative of CKS or Milo's except by an instrument in writing executed by both Parties hereto.

23. **Counterparts**: This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute the same agreement. Signatures to this Agreement transmitted by facsimile, by electronic mail in "portable document format" (".pdf"), DocuSign, or by any other electronic means that preserves the original graphic and pictorial appearance of the Agreement, shall have the same effect as physical delivery of the paper document bearing the original signature.

*[Signatures Contained on Next Page]*

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed by their duly authorized representatives effective as of the defined Effective Date first written above.

<u>**MILO'S:**</u>

**MILO'S TEA COMPANY, INC.**

By: _Carl Evans_ (DocuSigned by: 2E4324D32DA947E...)

Print Name: Carl Evans

Title: Vice President Operations

Date: 9/18/2020

<u>**CKS:**</u>

**C.K.S. PACKAGING, INC.**

By: _John R. Sewell_ (DocuSigned by: C5243EBDA52D428...)

Print Name: John R. Sewell

Title: CEO

Date: 9/18/2020

DocuSign Envelope ID: 40171ABA-0E0F-433D-B655-AB90370CE2D5

## Schedule A
## Product Descriptions and Specifications
### [Drawings and Specifications Attached Behind This Schedule]

| *Specifications* | |
|---|---|
| Container Name/Design | 12oz Round Decanter |
| Container Size | 12oz. |
| Resin Type | HDPE |
| Weight | 19 grams (+/-2) |
| Color | Natural |
| Packaging | Bag |
| Unitizing | 340 Bottles/Bag |
| Labeling | N/A |
| Neck finish | 38mm DBJ |
| Construction | Monolayer |
| Truckload Quantity | 184,960 (floor loaded) |

| *Specifications* | |
|---|---|
| Container Name/Design | 20oz Round Decanter |
| Container Size | 20oz. |
| Resin Type | HDPE |
| Weight | 27 grams (+/-2) |
| Color | Natural |
| Packaging | Bag |
| Unitizing | 248 Bottles/Bag |
| Labeling | N/A |
| Neck finish | 38mm DBJ |
| Construction | Monolayer |
| Truckload Quantity | 109,616 (floor loaded) |

| *Specifications* | |
|---|---|
| Container Name/Design | 64oz Dairy with 3/4oz Volume Plug |
| Container Size | 64oz. |
| Resin Type | HDPE |
| Weight | 42 grams (+/-2) |
| Color | Natural |
| Packaging | Bag |
| Unitizing | 108 Bottles/Bag |
| Labeling | N/A |
| Neck finish | 38mm DBJ |
| Construction | Monolayer |
| Truckload Quantity | 40,392 (floor loaded) |



| Specifications | |
|---|---|
| Container Name/Design | 128oz No Logo |
| Container Size | 128oz. |
| Resin Type | HDPE |
| Weight | 65 grams (+/-2) |
| Color | Natural |
| Packaging | Bag |
| Unitizing | 48 Bottles/Bag |
| Labeling | N/A |
| Neck finish | 38mm DBJ |
| Construction | Monolayer |
| Truckload Quantity | 17,952 (floor loaded) |

| Specifications | |
|---|---|
| Container Name/Design | 128oz Milo's Logo |
| Container Size | 128oz. |
| Resin Type | HDPE |
| Weight | 68 grams (+/-2) |
| Color | Natural |
| Packaging | Bag |
| Unitizing | 48 Bottles/Bag |
| Labeling | N/A |
| Neck finish | 38mm DBJ |
| Construction | Monolayer |
| Truckload Quantity | 17,952 (floor loaded) |


71006 64oz_dwg.pdf


MA8487-2 Milo Tea_128oz 7-31-18.p


MA6080 20oz Round 11-1-18.PDF


MA4028 12oz Round.PDF


CE


JRS







DocuSign Envelope ID: 40171ABA-0E0F-433D-B655-AB90370CE2D5





DocuSign Envelope ID: 40171ABA-0E0F-433D-B655-AB90370CE2D5

## Schedule B

| | 3-Tiered Rebate Structure - Example for 128oz. | |
|---|---|---:|
| Tier 1 | Growth Threshold | 0.00% |
| | Baseline Volume* | 60,736,944 |
| | Period Volume | 60,737,000 |
| | Sales Price/m | $149.09 |
| | Sales Revenue | $9,055,083 |
| | Rebate % | 0.50% |
| | Rebate/$Payout | $45,275 |
| Tier 2 | Growth Threshold | 20% |
| | Baseline Volume* | 60,736,944 |
| | Period Volume | 72,884,000 |
| | Sales Price/m | $149.09 |
| | Sales Revenue | $10,866,040 |
| | Rebate % | 1.00% |
| | Rebate/$Payout | $108,660 |
| Tier 3 | Growth Threshold | 40% |
| | Baseline Volume* | 60,736,944 |
| | Period Volume | 85,032,000 |
| | Sales Price/m | $149.09 |
| | Sales Revenue | $12,677,146 |
| | Rebate % | 1.50% |
| | Rebate/$Payout | $190,157 |

*Baseline volume period: 12-mo. unit sales by bottle size 7/1/19-6/30/20
Annual Rebates are calculated based on growth over prior year.